E-FILED
Friday, 25 January, 2013  01:31:21 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SANDRA NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-cv-3268 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Sandra A. Nelson appeals from the denial of her application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Nelson has filed a Motion for Summary Judgment (d/e 8), and Defendant Commissioner of Social Security has filed a Brief in Support of Summary Affirmance (d/e 12).  The District Court referred this matter for a Report and Recommendation.  Text Order entered January 8, 2013.  For the reasons

set forth below, this Court recommends that the Decision of the

Commissioner should be reversed and remanded for further proceedings.

## STATEMENT OF FACTS

Nelson was born on October 26, 1964.  R. 132-34.  She has a

general equivalency diploma.  Answer to Complaint (d/e 4), attached

Certified Copy of Transcript of Record of Proceedings (R.), at 34.  She

worked as a nurse's assistant, a cashier, a front desk clerk, and a

convenience store manager.  The store manager job is considered skilled

and the others are considered semi-skilled.  R. 276.  The Social Security

record of her earnings indicates that she worked primarily as a nurse's

assistant in nursing homes.  R. 151-57.  She was last engaged in

substantial gainful activity in 2005.  R. 155-57.  She alleged that she

became disabled on July 1, 2005.  R. 132.

Nelson suffers from obesity, diabetes, small fiber diabetic peripheral

neuropathy, asthma, carpal tunnel syndrome, possible restless leg

syndrome, sleep apnea, problems associated with an injury to the right

knee, and depression.  From 2005 to 2009, healthcare professionals have

variously recorded Nelson's height to be from five feet two inches to five

feet five inches tall, and her weight to vary from 269 pounds to 313 pounds.

E.g., R. 306, 384, 419, 478, 463.  Her body mass index (BMI) was

3:10-cv-03268-SEM-BGC   # 13    Page 3 of 28

calculated at 46.9 based on a height of five feet three and one-half inches and a weight of 269 pounds.[1]  R. 429.

On July 18, 2005, a neurologist, Dr. Koteswara Narla, M.D., conducted an EMG/nerve conduction study of Nelson's lower extremities. In 2004, Dr. Narla performed a similar study of Nelson's arms and found severe carpal tunnel syndrome in the left wrist.  Nelson then underwent successful left carpal tunnel release surgery.  On examination, Nelson had decreased pinprick sensation up to her knees and joints, and no reflexes in her lower limbs.  Dr. Narla also found decreased peripheral pulses on the left side.  The EMG/nerve conduction study was normal.  Dr. Narla opined that Nelson had small-fiber diabetic peripheral neuropathy.  He also stated that her symptoms suggested restless leg syndrome.  Dr. Narla recommended Klonopin for the restless leg syndrome.  R. 386-88.

On September 26, 2005, Nelson saw her primary care physician, Dr. Richard Bivin, M.D., for leg pain, migraine headaches and difficulty sleeping.  Dr. Bivin referenced Dr. Narla's report and conclusions that she had peripheral neuropathy and restless leg syndrome.  R. 376-77. Dr. Bivin recommended a sleep study as well as an evaluation for bariatric surgery because of Nelson's "morbid" obesity.  R. 377.  Dr. Bivin's noted

---

[1] BMI is an index used to evaluate obesity.  BMI is the ratio of an individual's weight in kilograms to the square of her height in meters. A BMI in excess of 40 indicates extreme obesity.  SSR 02-1p, 2002 WL 34686281, at *2.

Page **3** of **28**

that Nelson was taking Neurontin, Klonopin, Lisinopril, Zoloft, Nortriptyline, Glucophage, Lipitor, and Zetia for her various conditions.  R. 376.

Nelson continued to see Dr. Bivin periodically.  During these visits in 2005 and 2006, Nelson complained of pain in her legs and feet, pain in her left hand, diffuse pain, migraine headaches, difficulty sleeping, and fatigue. R. 290-91, 292-92, 297-99, 361-65, 373, 377.  In January 2006, Nelson reported that the Neurontin and Klonopin helped initially, but her symptoms were worsening.  R. 372.  Dr. Bivin continued Nelson's medications. Dr. Biven's notes from April 2006, indicated that he had taken Nelson off the Lisinopril and Nortriptyline, and added Mirapex to her other medications.  R. 289,

On May 17, 2006, Nelson saw Dr. Vittal Chapa, M.D., for a consultative examination.  R. 305-12.  Dr. Chapa secured a medical history from interviewing Nelson as part of the examination.  Nelson reported that she had pain in her legs and feet, and she could not sit or stand for any length of time.  She said she had pain in her legs when she walked, and she could only walk half a block before stopping due to her leg pain.  On examination, Nelson could bear weight and ambulate without ambulatory aids; her abdomen was obese; she had diminished peripheral pulses; she had full range of motion in her extremities and spine; straight leg raising

tests were negative; she had normal muscle strength; and she had good grip strength in both hands and could perform fine and gross motor manipulations with both hands.  R. 306-07, 310-11.  Dr. Chapa diagnosed peripheral vascular disease/intermittent claudication, and diabetic neuropathy.  R. 307.

On June 1, 2006, state agency physician Dr. Richard Bilinsky, M.D., prepared a functional capacity assessment of Nelson.  R. 313-20. Dr. Bilinsky opined that Nelson could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for two hours a day; could sit for six hours a day; could frequently stoop, kneel, crouch, and crawl; could occasionally balance and climb ramps or stairs; and could never climb ladders, ropes, and scaffolds.  R. 315.  Dr. Bilinsky opined that Nelson should avoid concentrated exposure to vibration and hazards. R. 317.  Dr. Bilinsky opined that Nelson suffered from diabetic peripheral neuropathy, restless leg syndrome, and obesity.  R. 313.

On November 1, 2006, Nelson underwent a sleep study.  The study report found very mild obstructive sleep disordered breathing.  R. 322-23.

In 2006 and 2007, Nelson continued to see Dr. Bivin.  She continued to complain about leg pain and difficulty sleeping, as well as increased breathing problems, decreased energy, and left hand pain.   R. 358-65,

371-73.  Dr. Bivin continued her medication for her conditions.  In January 2007, Nelson was taking Zoloft, Klonopin, Metformin, Neurontin, Requip, Lipitor, Toradol, Wellbutrin, and TAC.[2]

On March 19, 2007, Nelson went to see Dr. Narla again.  Nelson complained of left hand numbness and headaches.  Dr. Narla diagnosed left carpal tunnel syndrome and migraine headaches.  Dr. Narla stated that Nelson was taking Lyrica and nortriptyline for these conditions.  Dr. Narla recommended continuing the Lyrica and adding Midrin for acute headaches.  R. 380.  He also recommended that Nelson to see a surgeon about her wrist.  R. 380, 383.

On March 9, 2007, Nelson underwent an MRI of the brain because of her headaches.  The results showed "no definite abnormality."  R. 392.

On March 27, 2007, Dr. Bivin completed a psychiatric evaluation form for Nelson.  R. 393-96.  Dr. Bivin diagnosed Nelson with depression, fibromyalgia, diabetes, and peripheral neuropathy.  R. 393, 396.  Dr. Bivin stated that Nelson had had depression for two years and it was worsening. He stated that Nelson reported that the depression had been better controlled four years earlier.  R. 393.  Dr. Bivin stated that Nelson wanted to sleep all day.  R. 393.  Dr. Bivin noted that Nelson's mood improved with

---

[2] The list of medications is handwritten and parts are difficult to read.

medication.  R. 396.  Dr. Bivin opined that Nelson was unable to manage

own funds.  R. 396.

     The psychiatric format included the following instruction:

> Please describe the claimant's ability to do work-related
> activities such as understand, carry out and remember
> instructions; respond appropriately to supervision, co-workers,
> and customary work pressures:

R. 396.  In response, Dr. Bivin opined that Nelson "can't stand sit or lay in

one position for more than 1 hour due to pain in legs/feet."  R. 396.

     On April 13, 2007, a psychologist Dr. Erika Altman, Ph.D., prepared a

mental assessment of Nelson.  R. 397-414.  Dr. Altman opined that Nelson

had mild restrictions in activities of daily living; mild difficulties in

maintaining social functioning; moderate difficulties in maintaining

concentration, persistence, or pace; and no episodes of decompensation.

R. 407.  Dr. Altman opined that Nelson had the ability to understand,

remember, and carry out more detailed instructions with some concrete

variables, make some independent judgments, and maintain alertness and

attention to detail.  R. 413.  Dr. Donald Henson, Ph.D., affirmed the

assessment on September 23, 2007.  R. 447-49.

     On June 19, 2007, Dr. Chapa performed another consultative

examination.  R. 416-21.  Nelson reported that she had depression and

diabetic neuropathy.  She was unable to stand for more than one hour, she

was not comfortable sitting for more than one hour, and she had pain in both legs when walking.  On examination, Nelson could bear weight on both feet, but could not toe walk or heel walk and had decreased sensation in her feet.  Nelson was overweight and complained of hip and knee pain. She had decreased pinprick sensation in her feet.  She had decreased range of motion in her hips and knees, but full range of motion in the other joints.  Straight leg raising tests were negative.  Nelson had good grip strength and could perform fine and gross manipulations with both hands, but could have difficulty performing repetitive manipulations with the left hand.  Dr. Chapa diagnosed diabetes, diabetic neuropathy, obesity, and depression.  R. 420.

On June 19, 2007, Dr. Virgilio Pilapil, M.D., prepared a functional capacity assessment.  R. 422-29.  Dr. Pilapil opined that Nelson could occasionally lift 20 pounds and frequently lift 10 pounds; could stand and/or walk for six hours in a workday; sit for about six hours in a workday; could occasionally balance and climb ladders, ropes, and scaffolds.  Dr. Pilapil opined that Nelson should avoid concentrated exposure to hazards. Dr. Pilapil listed Nelson's relevant conditions as neuropathy, obesity, and left carpal tunnel syndrome.  Dr. Pilapil stated that Nelson's BMI was 46.9.

3:10-cv-03268-SEM-BGC  # 13  Page 9 of 28

R. 429.  Dr. Ernst Bone, M.D., affirmed Dr. Pilapil's opinions on September 25, 2007.  R. 447-49.

In early 2008, Nelson continued to see Dr. Bivin.  She continued to report leg pain that interfered with her sleep, and also right knee pain and low back pain.  R. 490-92.  She reported that Vicodin in combination with the other medicine seemed to help her sleep.  R. 490.  On January 18, 2009, she received a cortisone injection in her right knee.  R. 490.  She continued to report leg pain and problems sleeping throughout 2008, as well as problems with her right knee, and with her breathing.  R. 467-92.

On February 19, 2008, Nelson underwent an MRI of her right knee. The MRI report stated that she twisted her knee a week earlier.  The MRI showed a small to moderate joint effusion, osteoarthrosis, a small interosseous ganglion, and degeneration of the medial meniscus without a definite tear.  R. 518.  On March 12, 2008, Nelson saw an orthopedic specialist, Dr. Rodney Herron, M.D., to have her right knee evaluated. Dr. Herron diagnosed a knee injury.  Dr. Herron recommended physical therapy.  R. 451-52.

Nelson continued to see Dr. Bivin in 2009.  R. 457-66, 561-67. Nelson complained of a cough, pain in her lower extremities and lower back, daytime sleepiness, high blood sugar, difficulty breathing at night,

Page **9** of **28**

shortness of breath, swelling in her hands and feet, and headaches.  She complained mainly about her cough and her breathing.  Dr. Bivin continued to prescribe medications for her conditions and to monitor her.

On March 19, 2009, Nelson underwent another sleep study.  The report found mild to moderate sleep disordered breathing with apneas and hypopneas.  R. 522-23.  The report stated that the insufficient sleep may have contributed to Nelson's daytime sleepiness.  R. 522-23.

In May and July 2009, Nelson saw a pulmonary specialist Dr. Jerry Reedy, M.D., for her cough.  R. 554-60.  Dr. Reedy opined that Nelson's cough was caused by reflux, asthma that was not optimally controlled, and smoking.  R. 554.

On July 12, 2009, Nelson went to the hospital emergency room complaining of severe, constant pain in her legs.  R. 574-78.

On September 4, 2009, Nelson went to the Southern Illinois University School of Medicine for treatment of her diabetes and cough. R. 579.  Her complaints included sleepiness, fatigue, pain, sleep disturbance, and depression.  R. 580.  Her diabetes was uncontrolled and her asthma was exacerbated.  R. 600-01.  Spirometry testing showed airway obstructions with severely reduced FEV1, and a reduction in vital

capacity. R. 599.[3]  Nelson's prescribed medications were Mirapex, Wellbutrin, Klonopin, Remeron, Glucophage, Pepcid, Nortriptyline, Zocor, Vicodin, Glipizide, Advair, Spiriva, Lantus, and Humalog.  R. 584.

On September 14, 2009, the Administrative Law Judge (ALJ) conducted a hearing by video conference.  R. 27-56.  Nelson and her attorney appeared in Springfield, Illinois, and the ALJ and vocational expert Ron Malec were in Peoria, Illinois.  R. 29.

Nelson testified first.  Nelson was 44 years old, and single.  She and her seventeen year old daughter lived with her mother.  They lived in her mother's one-story house.  R. 31-32.  Nelson had a GED and was taking online college courses in criminal justice.  R. 34.  She stopped working as a nursing assistant because she could not do the required lifting.  R. 34.

Nelson testified that she could not work because of the neuropathy in her legs.  She testified that she could not stand or sit in any one position for longer than an hour.  She testified, "My feet constantly feel I'm walking on pins and needles.  My shins and my legs feel like the skin is being ripped off the bone."  R. 35.  Nelson then testified that she could only stand for 20 minutes and only sit for 20 to 30 minutes.  The ALJ asked for an explanation, whether she could sit and stand for an hour or only for a

---

[3] FEV1 refers to a measure of a one-second forced expiratory volume.  Listing 3.00(E).

shorter period of time.  R. 34-35.  Nelson testified, "I can – I have to move around.  If I'm sitting, before the hour is up I have to get up and move.  On my good days I can sit or stand for an hour.  On my not so good days, I can't do that."  R. 35.  The ALJ then asked Nelson how long she could alternate between sitting and standing before she would need to lie down.  Nelson testified, "Hour, a little over an hour."  R. 36.

Nelson said that she could walk the length of the hall, about 100 feet, before she would have to stop.[4]  R. 37.  Nelson testified that she could lift 15 pounds once in a day.  She testified that she had to turn sideways and use a cane to go up and down stairs.  R. 37-38.  She testified that she had used a cane for eight or nine months.  She testified that a doctor prescribed the use of the cane.  Nelson testified that she quit smoking about 2 weeks before the hearing.  She formerly smoked a pack a day.  Her mother bought the cigarettes for her.  R. 40.

The ALJ asked Nelson how her condition had changed since 2001.  Nelson testified that her pain had gotten worse.  The ALJ asked Nelson to estimate her pain on a scale of 1 to 10.  Nelson said her pain was between 6 and 8 in 2001, and progressed to a 9 by 2005, to 9 ½ by 2007, and to a 10 by 2008.  R. 38-39.  Nelson testified that her pain was between 9 and 10

---

[4] Nelson testified that she could walk the length of the hall.  She estimated the hall to be 300 feet, but her attorney and ALJ agreed the hallway in question was about 100 feet in length.  R. 37.

thereafter.  She testified that the pain was about 9 ½ at the time of the hearing.  R. 39.

Nelson testified that she drove less than 20 miles per week.  She took care of her personal hygiene; she dressed herself and fed herself.  R. 40. Nelson testified that she prepared meals, did laundry, did the dusting, and washed dishes.  She needed help making beds.  She did not vacuum, mop, or sweep the floors.  R. 40-41.  She did the grocery shopping.  R. 41.

On examination by her attorney, Nelson testified that she worked as a cashier at a Casey's General Store.  R. 41.  Nelson testified that several years earlier she worked briefly as a front desk clerk at a motel.  She testified that she could not do the job because the job required standing most of the time.  R. 43-44.  Social Security records indicate that she earned $2,497.00 in 2000 and $1,013.00 in 2001 at Casey's General Store, and $1,989.00 at a Day's Inn in 1995.  R. 156.

Nelson testified that in a typical day, she lay down three to four hours in bed.  Her pain varied from day to day.  She testified that her legs were hurting and her fingers were tingling as she was testifying.  R. 44.  She testified that she had poor concentration and attention because of her lack of sleep and because of the side effects from some of her medications. She testified that Klonopin, Vicodin, Wellbutrin, and Mirapex made her

sleepy.  R. 46.  She testified that she usually went to sleep between 9:00 p.m. and 9:30 p.m., but was awake by midnight to 1:00 a.m.  Nelson usually remained awake until her daughter left for school in the morning. R. 45-46.

Nelson testified that her breathing has improved since she stopped smoking.  She testified that she did not cough as much.  R. 46-47.

Nelson testified that she has modified her daily activities because of her condition.  About four or five months before the hearing, she started riding in a cart at the grocery rather than walking and pushing a basket. R. 47.  With respect to bathing or dressing, she said, "I get real short of breath by the time I'm done."  R. 47.  She testified that she had to sit down and rest after bathing or dressing.  She testified that she folded the laundry and she put laundry into the washing machine, but her daughter or her mother carried the laundry.  R. 47.

Nelson testified that her feet swelled every day.  R. 48. The swelling raised her pain level and made walking painful.  R. 49.  When this occurred, she had to lie down on the couch with her feet propped up. R. 48.

Vocational Expert Malec then testified.  The ALJ asked Malec the following question:

> I'd like you to assume we have an individual of the same age, education and experienced (sic) as the claimant.  This individual is limited to light work, limited to occasional postural activities with no ropes, ladders or scaffolds.  Needs to avoid – concentrated exposure to hazards, and is limited to less than complex tasks.  Now would these restrictions affect the performance of the claimant's past relevant work?

R. 50.   Malec opined that such a person could perform Nelson's past work as a cashier.  R. 50.

The ALJ then asked Malec:

> Now I'd like you to assume we have an individual of the same age, education and experience as the claimant.  This individual is limited to sedentary work with a sit/stand option.  Limited to occasional postural activities with no ropes, ladders or scaffolds.  Need to avoid concentrated exposure to hazards and limited to less than complex tasks.  Now would these restrictions affect the performance of the claimant's past relevant work?

R. 50.  Malec opined, "That would eliminate all the past work, Your Honor."

R. 50.  Malec, however, opined that such a person could perform two types of cashier jobs and an appointment clerk job.  Malec testified that 19,100 of the cashier jobs and 22,500 of the appointment clerk jobs existed in Illinois, and 471,200 cashier jobs and 477,900 appointment clerk jobs existed in the national economy.  R. 51.  Malec testified that the experience as a cashier provided the transferable skills to perform the cashier jobs and the

experience as a front desk clerk provided transferable skills to perform the appointment clerk job.  R. 50-51.

Malec testified that the cashier jobs and appointment clerk jobs had the same reasoning level as Nelson's past work as a cashier and front desk clerk.  He further opined that these jobs did not involve performing complex tasks.  R. 53.

Malec testified that a person in a cashier or appointment clerk position could not walk away from the work station except at specified break times.  R. 54.  Malec testified that a person could not perform these jobs if the person needed extra breaks of 15 to 20 minutes to lie down or prop up their feet.  R. 54-55.  The ALJ then concluded the hearing.

Malec testified that the hypothetical person could not perform any jobs if the individual needed to miss three or more days of work a month. R. 51, 55.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on September 30, 2009.  R. 13-26.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.

20 C.F.R. §§ 404.1520(c), 416.920(c).

If true, Step 3 requires a determination of whether the claimant is so

severely impaired that he is disabled regardless of the claimant's age,

education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To

meet this requirement at Step 3, the claimant's condition must meet, or be

medically equivalent to, one of the impairments specified in 20 C.F.R. Part

404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d),

416.920(d).  If the claimant's impairments, combination of impairments, do

not meet or equal a Listing, then the ALJ proceeds to Step 4.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  The ALJ must

determine the claimant's RFC in order to perform this analysis.  If the

claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(f),

416.920(f).

The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005); <u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Nelson met her burden at Steps 1 and 2.  She was not engaged in substantial gainful activity and she suffered from severe impairments.  The ALJ found that Nelson suffered from diabetes mellitus, peripheral neuropathy, asthma, history of arthroscopic surgery of the right knee, and mild depression.  R. 19.  The ALJ found that Nelson's impairments and combination of impairments did not meet any Listing. R. 22.  The ALJ considered the Listings for diabetes, breathing problems, and depression.  R. 22; Listings 3.03, 9.08A, and 12.04.[5]

At Step 4, the ALJ initially stated that Nelson, "**has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except ..**"  R. 22 (emphasis in original).  The ALJ did not state the exceptions at this point.  The ALJ later stated that Nelson was limited to sedentary work subject to additional limitations:

---

[5] The Court was unable to locate a Listing 9.08A; however, the Listings under 9.00 covers endocrine problems, including diabetes.

The limitation to the restricted range of sedentary work as described accommodates any limitations she may have from her objectively multiple medical impairments and gives her subjective complaints some credit.  She is limited to sedentary work with a sit/stand option, which accommodates limitations from peripheral neuropathy and her complaints of difficulty being on her feet, walking and even sitting for long periods.  It also accommodates pain complaints and fatigue.  She is limited to occasional postural activities and no concentrated exposure to hazards due to any possible imbalance problems and difficulties due to pain, fatigue and obesity.  Mentally she is limited to less than complex tasks.

R. 24.  In making this finding, the ALJ considered the opinions of Drs. Bilinsky and Pilapil, but found that the doctors overstated Nelson's exertional abilities in light of the rest of the record, including Nelson's testimony at the hearing.  R. 24.  ALJ did not address Dr. Bivin's opinion that Nelson could not lay, sit, or stand for more than one hour at a time. The ALJ stated, "Dr. Bivin noted only the claimant's allegations that she had difficulty sitting, standing and walking."  R. 23.  The ALJ then found at Step 4 that Nelson could not perform her prior work. R. 24.

At Step 5, the ALJ again stated that Nelson was limited to light work:

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Rule 202.21.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.

R. 25.  The Medical-Vocational Guidelines (Grid) are a set of regulations that control whether a claimant is disabled when the claimant can perform the full range of work at an exertional level (e.g., sedentary work or light work) and has no other limitations (e.g., mental limitations or environmental restrictions that affect work).  20 C.F.R. 404 Subpart P, Appendix 2. Rule 202.21 in the Grid states a person under the age of 49 who has a high school education and can perform the full range of light work, and has no non-exertional limitations, is not disabled.

The ALJ continued with his analysis because Nelson was subject to additional limitations and could not perform the full range of light work.  The ALJ stated:

> To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as cashier (19,100 jobs in the state of Illinois) and appointment clerk (22,500 jobs).

R. 25.  Based on the expert's opinion, the ALJ found that the Commissioner met his burden at Step 5 and determined that Nelson was not disabled. R. 25.

Nelson appealed the decision to the Appeals Council.  The Appeals Council denied Nelson's request for review on August 17, 2010.  R. 1.  The ALJ's decision thereby became the decision of the Commissioner.  Nelson then appealed to this Court.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ's decision should be reversed because the ALJ failed to address adequately several issues and because the RFC findings were internally inconsistent. The ALJ thereby failed to build that logical bridge from the evidence to his conclusions.

The ALJ failed to address the impact of Nelson's obesity at Steps 2 and 3 of the Analysis. Obesity is a recognized medical condition that can either cause a person to be disabled or exacerbate the disabling effects of a person's other impairments. As such, the ALJ must consider obesity throughout the Analysis. SSR 02-1p, 2002 WL 34686281, at * 3. The ALJ should rely on medical opinions in the record for a finding of obesity. Id. at *3; see Clifford, 227 F.3d at 873. Numerous physicians diagnosed Nelson with obesity. Dr. Pilapil calculated her BMI at 46.9 when she weighed 269 pounds. A BMI over 40 is considered Level III extreme obesity. SSR 02-1p, 2002 WL 34686281, at *2. Obesity clearly was one of Nelson's impairments. Obesity is considered a severe impairment at Step 2 if it causes more than minimal functional limitations. Id. at *4. The ALJ did not identify Nelson's obesity as a severe impairment and did not explain why the evidence led him to that conclusion, even though her condition was diagnosed and was extreme. The failure to explain all of the relevant evidence at this point in the Analysis was error.

The ALJ also did not address the impact of Nelson's obesity at Step 3 of the Analysis.  Obesity can exacerbate other impairments, such as Nelson's sleep apnea, diabetes, neuropathy, carpal tunnel syndrome, and depression.  The combination of those impairments with her obesity might make her condition medically equivalent to a Listing.   See Barrett v. Barnhart, 355 F.3d 1065, 1068-69 (7th Cir. 2004); SSR 02-1p, 2002 WL 34686281, at *5.  The ALJ did not address the issue.  The Court, therefore, does not know whether the ALJ considered the evidence concerning her obesity in reaching his conclusions.  Again, the failure to address the material evidence was error in this case.

In addition, to these errors, the ALJ's RFC analysis was internally inconsistent.  The ALJ stated in two places that Nelson had the RFC to perform a limited range of light work, but stated in another place that she had the RFC to perform a limited range of sedentary work.  At Step 5, the ALJ found that Nelson could perform a range of unskilled light jobs based on Malec's opinions regarding available semiskilled sedentary jobs.  R. 25.

The ALJ also failed in his formulation of the RFC to address Dr. Bivin's opinion Nelson, "can't stand sit or lay in one position for more than 1 hour due to pain in legs/feet."  R. 396.  This statement was an opinion by Nelson's treating physician about her functional limitations.

A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  The ALJ did not discuss this opinion, let alone whether the opinion was entitled to controlling weight in this case.  The ALJ's failure to address this evidence, again, was error.

Finally, the ALJ failed to address at Step 5 whether Nelson worked as a cashier and front desk clerk long enough to make those jobs part of her past relevant work.  Malec opined that the hypothetical person with Nelson's background and limited sedentary RFC listed by the ALJ could perform the semiskilled jobs of cashier and appointment clerk because the person was experienced as a cashier and front desk clerk and had transferable skills from those past positions.  R. 50-51.

A particular job constitutes past relevant work if the claimant performed the job within the last 15 years and the person performed the job long enough "to have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation." SSR 82-62 (January 1, 1982).  The time needed to learn a job to this level "depends on the nature and complexity of the work."  Id.  The

Commission's Operations Manual states that the Specific Vocational

Preparation (SVP) information in the Department of Labor's Dictionary of

Occupational Titles (DOT) is a "guideline to help determine how long it

would generally take to learn a particular job."  Program Operation

Manual System (POMS), DI 25005.015 Determination of Capacity

for Past Work – Relevance Issues, available at

https://secure.ssa.gov/apps10/poms.nsf/aboutpoms, viewed January 18,

2013.  The SVP, however, is only a guideline.  Id.

    The cashier and clerk jobs that Malec identified have an SVP of 3.

R. 52.[6]  An SVP of 3 means that the job requires over one month and up to

and including three months of full time work to learn the job.

DOT (4th ed., Rev. 1991) – Appendix C, Components of Definition Trailer, II

Specific Vocational Preparation (SVP), available at

http://www.oalj.dol.gov/libdot.htm, viewed January 22, 2013.   Thus, the

skill level of these jobs would indicate that Nelson needed to perform the

cashier and front desk clerk jobs full time for more than one month, and

perhaps, up to three months before she knew the job well enough to

---

[6] Malec listed jobs with DOT numbers 211.482.014 (food checker), and 237.367-010 (appointment clerk). R. 52; DOT, Occupational Definitions.  Malec also listed a DOT number 291.482.010, but the DOT contains no occupational definition with this number.  The DOT lists the job of cashier tube clerk at 211.482.010.  Malec may have meant this listing.  All three listings have and SVP of 3.

conclude that the job was past relevant work for purposes of Step 5 of the Analysis, and that she acquired the relevant transferable skills.

The record does not indicate clearly whether Nelson worked the cashier job and the front desk clerk job full time and whether she worked these jobs long enough to learn the jobs and to acquire transferable skills. Nelson testified that she worked briefly as a front desk clerk at a Days Inn. R. 42. Nelson testified that she worked as a cashier at a Casey's General Store, but did not indicate how long she held the position. R. 43. According to Social Security Administration records, she earned $1,989.00 at a Days Inn in 1995, and she earned $2,497.00 in 2000 and $1,013.00 in 2001 at a Casey's General Store. Nelson indicated at one point that she worked these jobs part time, but indicated elsewhere that she worked the cashier job full time. R. 161; R. 184.[7] The Commissioner had the burden at Step 5. The ALJ did not explain how the Commissioner established that Nelson worked these jobs long enough to make them part of Nelson's past relevant work, and did not address whether Nelson acquired the transferable skills on which Malec relied in rendering his opinions.

---

[7] Nelson also stated in a Work History Report that she worked as a manager at a gas station from August 2004 to March 2005, and that she worked from four to eight hours a day, four to five days a week. She stated that the job included running a cash register. R. 220-21. The Social Security records, however, do not show any earnings from work at a gas station in 2004 or 2005. R. 156-57. These discrepancies also require further inquiry by the ALJ to develop the record fully and accurately.

The failure to explain was again error. The accumulation of all of these unanswered questions requires the Court to recommend a remand.

The Commissioner argues that the ALJ's errors were harmless.  The Commissioner argues that the ALJ considered obesity sufficiently because he considered it in formulating the RFC and because he relied on physicians who considered Nelson's obesity when formulating their opinions.  The Commissioner concedes that the ALJ misspoke at times regarding the RFC, but argues that the misstatements were, again, harmless because the ALJ's analysis of the RFC is clear.  These errors might have been harmless if the ALJ had made just one or two of them. The cumulative effect of all of these errors, however, leaves the Court without a sufficient basis to conclude that the ALJ considered all of the material, relevant evidence.  The failure to address these matters also means that the ALJ did not build the required "logical bridge from the evidence to his conclusions."  Clifford, 227 F.3d at 872.  The Court, therefore, recommends a remand.

On remand, the ALJ can secure additional evidence to address the unanswered questions.  Nelson submitted to the Appeals Council additional medical evidence concerning Nelson's condition based on events that occurred after the hearing before the ALJ.  R. 615-17.  On remand, Nelson

should be able to present such evidence if relevant to all or a part of her claim, as well as any other relevant evidence.

WHEREFORE this Court RECOMMENDS that Motion for Summary Judgment (d/e 8) be allowed and the Commissioner's request for summary affirmance be denied.  The decision of the Commissioner should be reversed and remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

Enter:      January 25, 2013

                              s/ Byron G. Cudmore
                    UNITED STATES MAGISTRATE JUDGE